WARNER, J.
Thomas Grant appeals the final declaratory judgment of the probate court interpreting a provision of a codicil to the will of Grant’s father, Milton Grant. That provision, according to the court, did not provide for lifetime employment with Milton’s company, contrary to Thomas Grant’s contention. Because the will provision was ambiguous, and the trial court made its determinations based upon competent substantial evidence, we affirm.
Thomas filed a petition for construction of will and other declaratory relief against Bessemer Trust, the personal representative, asking for enforcement and/or damages for an alleged violation of a codicil of his father Milton’s will, which he alleged required Bessemer to provide him lifetime employment with the parent company of the corporate conglomerate that his father had founded. It is undisputed that Thomas was terminated by company executives *832 with the knowledge of Bessemer Trust. Bessemer filed a counterclaim for declaratory relief, requesting interpretation of the employment codicil. Bessemer ultimately contended that Thomas was entitled only to at-will employment and that his employment at one of the company’s subsidiaries for sixteen months between Milton’s death and Thomas’s termination satisfied the employment provision.
In responding to cross-motions for summary judgment, the trial court ruled that the will provision was ambiguous, thus requiring an evidentiary hearing to resolve the ambiguity. The court then held an extensive trial on the issues at which the following evidence was presented.
Milton Grant, the C.E.O. and 100% owner of the stock of Grant Communications, Inc., a company that operates a number of television stations across the country, was the father of Thomas, as well as two daughters. Milton built Grant Communications into a highly successful and valuable conglomerate of subsidiary companies from which he intended his family to prosper forever. He was devoted to his company.
He was also devoted to his only son, Thomas. He wanted Thomas to work in the company and began to employ him in 1996 in various capacities. At the time of Milton’s death, Thomas was the national sales manager of a television station in Roanoke, Virginia, with responsibilities for handling national accounts for one local station. Although Thomas claimed to have been extremely successful, testimony from Milton’s business associates indicated that Milton was concerned about Thomas’ business abilities. During his fifteen years in the company prior to Milton’s death, Thomas was never promoted to station manager, which would have been the progression to corporate management. While Thomas and other witnesses testified that Milton expressed a desire that Thomas take over the company one day, other witnesses testified that Milton did not think that Thomas was cut out for management.
Concerned about his family as well as his business should he die, Milton began developing his estate plan around 2000. His beneficiaries included his three children, his wife, from whom he was separated for many years, and his long-time companion and mother of Thomas. He turned to his estate planning attorney, Dan Miel-nicki, and later to his Chief Financial Officer and close associate, Mark Ryan, for assistance with his planning. Thomas was not involved at all in the development of the estate plan. Milton also relied on his long-time counsel and advisor, Jack Lewis, an attorney in Northern Virginia, to be the business trustee of the company upon Milton’s death. Lewis did not know of the existence of Thomas or that he worked for the company until shortly before Milton died.
The completed estate plan included a will and various trust agreements. Milton’s will provided that his 100% ownership of Grant Communications would pour over into two trusts. Until the pour over occurred, the will gave the personal representative the power to oversee the control and operation of the business. While the stock was in the estate, all decisions were to be made by the personal representative, which was Bessemer Trust, and after the stock was transferred from the estate to the trust, decisions were to be made by the business trustee, Jack Lewis. In the will and all trust documents, there was a provision regarding the personal representative’s and the trustee’s powers with respect to employment:
to engage, compensate and discharge, or as a stockholder or director of any such corporation, to vote to engage, compensate and discharge such managers, em *833 ployees, agents, attorneys, accountants, consultants, advisors, or other representatives of any such business or corporation as may be deemed advisable, including, without limitation, any fiduciary under this will or an officer or employee of any corporate fiduciary under this will or any person who is a beneficiary under this will....
Last Will and Testament, Article XII, Section (A)(25) (emphasis supplied). See also generally Milton Grant Family Trust, Article XI, Section (B)(4). Thomas and his other family members were all beneficiaries of the trust. The will and trusts were executed in August 2006. The fiduciaries were also given the authority to sell the business if they deemed it prudent.
All who testified agreed that Milton wanted his son to continue as an employee of the company. Shortly after the execution of the will and trusts, a representative of the original appointed personal representative contacted Mielnicki and asked about an employment agreement for Thomas, because none of the estate planning documents contained any provision for employment for Thomas. The representative testified that Milton had a twofold concern: first, that his son have a good work ethic and not simply sit back and enjoy his inheritance, and second, that Thomas would have a guaranteed position with the company.
Mark Ryan, Grant Communications’ CFO, also wrote Mielnicki, suggesting that they needed to come up with something to guarantee Thomas’ employment with a $125,000 minimum salary, as well as other work, should the Business Trustee sell the company. Mielnicki acknowledged the requests, but he specifically denied that he had been asked to draft an employment agreement. He had advised Milton that an employment agreement should not be included in testamentary documents. They discussed “gainful employment” for Thomas. Mielnicki admitted that based on his conversations with Milton it was clear that “he wanted his son to be involved in the business. There was no doubt about that.” However, Mielnicki advised Milton that Thomas should have an employment agreement and not place any directive regarding Thomas’ employment in the testamentary documents which Mielnicki was preparing. Milton, however, did not approve of employment agreements for any employees and had avoided them throughout his operation of the company, except for certain television personalities.
Ryan testified that Milton did not believe that Thomas was cut out for top corporate management. Thomas frequently caused problems in the corporation, but Milton did not want to hear about his son’s shortcomings. Because of them, however, Milton did not include Thomas on corporate policy discussions or share sensitive financial information with him.
In April 2007, Milton was diagnosed with a terminal illness. Ryan continued to act as a conduit to finish various details of Milton’s estate plan. A list of Business Directives composed by Ryan included a provision that Thomas continue with the business at a salary of $125,000. Attached was a “codicil” handwritten by Milton stating: “Keep [Thomas] with business + 120,000 + salary.” Another portion of the notes mentioned a price if the company were sold. While Ryan sent Mielnicki this list, which included a provision that Thomas would always be employed with the company, Ryan also explained that he had written these ideas down in “about ten seconds” and were his notes. Milton had never asked him to obtain an employment agreement for Thomas. Having already advised Milton that an employment provision by will was not appropriate but could be accomplished through an employment *834 agreement, Mielnicki prepared a codicil incorporating several of the changes that Milton desired to make. Included was the following provision with respect to Thomas’ employment with the company:
Employment provision for Thomas Jeffrey Grant. It is my intention that [Thomas] continue to be employed in a suitable and reasonable position in connection with the operation and management of my television station group. Accordingly, I hereby direct my Personal Representatives to make the necessary arrangements with my Business Trustee to ensure such employment and to ensure that his annual salary shall be no less than $125,000 per year, appropriately adjusted for annual cost of living increases.
Mielnicki testified that he chose to use certain precatory language in the employment provision based upon his prior conversations with Milton on the subject of will provisions and employment agreements. His advice to Milton was that he felt it was inappropriate to put a mandatory provision in a will, thus he considered the language precatory. Moreover, despite his advice that a guarantee of employment for Thomas could be accomplished through an employment agreement, Milton never directed anyone to draft such an agreement.
In a final codicil which Mielnicki did not prepare (no one could testify as to who prepared it), Milton appointed Andrew Pfeiffer to succeed him as Chief Executive Officer of Grant Communications. Milton explained his choice, writing, “Andrew has been my partner for more than 25 years and has helped me build these companies. He understands the companies’ dynamics and my wishes and my thinking better than anyone on the planet.”
After Milton died, Pfeiffer sent Thomas to Huntsville, Alabama, as national sales manager. He also gave Thomas a title of corporate vice-president. After sixteen months of employment at a salary equivalent of what was specified in the codicil to the will, Pfeiffer terminated Thomas.
The court rendered a lengthy final judgment. In discussing the evidence, the court found it to be significant that Milton was concerned with Thomas’ management abilities and never in any of the late codicils expressed an intention that Thomas should be running the company in five years, have lifetime employment, or work at the home headquarters in Fort Lauder-dale, as Thomas testified. Instead, Milton expressed in his Third Codicil that he placed his trust in Pfeiffer to run his conglomerate after Milton’s death. The court also found significant the fact that the Business Directives prepared by Ryan, which included a provision that Thomas always have employment with the company, were at variance with the codicil actually executed several days later by Milton. The court determined that the Business Directives were not legally binding documents, nor were they even prepared by Milton. “If it is to serve any value in interpretation of Milton’s testamentary intent, it suggests Milton was conflicted with respect to what he wanted to do with his beloved son, vis-a-vis Grant Communications .... ” The court then found that Thomas’ claim — that Milton intended him to have a corporate management position in Fort Lauderdale for life — untenable and completely contrary to the faith that Milton placed in Pfeiffer to carry on with the company.
In interpreting the employment codicil, the court concluded that it did not amount to a directive for lifetime employment, and the court concluded that Milton did not intend such a result. Milton could have prepared an employment contract during his lifetime to accomplish this result but *835 declined to do so. Thus, the provision was also not intended to be an employment contract. The first sentence in the codicil which expressed Milton’s intentions for his son to be employed in a suitable position with the company constituted a precatory statement, according to the court. The second sentence constituted a directive to the personal representative and business trustee to take the necessary steps to create and obtain for Thomas the type of position Milton intended in the first sentence. Because Milton had himself placed Thomas in the position of national sales manager at the Roanoke station, the court concluded that such a position was “suitable” within the meaning of the codicil, and his reassignment to the Huntsville station was a similarly suitable position. The court determined that “ ‘[e]nsure such employment,’ does not mean employment with the company will be maintained and guaranteed forever, but merely obtained.” As well, Thomas made a salary of $125,000 at his position, all of which requirements Bessemer accomplished to satisfy the directive. The court construed the provision as an employment at will arrangement. The court summarized its conclusions as follows.
(1) The Employment Provision of the First Codicil of Milton Grant, dated April 17, 2007, does not legally provide for an employment contract, or assurance of lifetime employment for Thomas.
(IA) Employment is not a real/personal property interest as that term is defined in section 731.201, Florida Statutes.... Employment is incapable of being devised or bequeathed in a will.
(IB) The right to employ Thomas, or the determination of the length of such employment, was not a right that Milton owned upon his death, but rather [was] a decision that belonged to Grant Communications. While Milton was alive, and as an officer, director and/or owner of a hundred percent of the stock, he could have, on behalf of Grant Communications, entered into an employment contract for a determinate or indeterminate period of time with Thomas. For whatever reason, whatever reason that may be, he chose not to do so.
(2) The employment provision is not in its entirety, precatory. The first sentence of said clause expressing Milton’s intentions as worded, is precatory. The second and final sentence thereof is a directive, similar to a multiplicity of directives that are oftentimes contained in testamentary documents. Such directive does not provide for guaranteed lifetime employment, or a contract ensuring such. An interpretation of this second sentence in the manner suggested by Thomas is simply a stretch, that is without factual and legal support. The second sentence as written merely directs the personal representative to see to it that upon Milton’s death, Thomas is employed with Grant Communications at a salary of $125,000 per year, to be annually adjusted for cost of living increases. Implicit, however, with such direction, is that such employment is at-will, and that Thomas is subject to dismissal upon reasonable grounds.
(Internal citation omitted). On a motion for rehearing, the court clarified that it arrived at its determination that the codicil provided only at-will employment, because a will was not the method for providing lifetime employment, nor was the wording of this codicil susceptible to that assurance. From this judgment, Thomas appeals.
The findings of a probate court present mixed questions of law and fact, and the appellate court decides whether the factual findings are supported by com *836 petent substantial evidence and the findings of law are reviewed de novo. See SAPG Sun City Ctr., LLC v. Kennedy, 79 So.3d 916, 919 (Fla. 2d DCA 2012). In reviewing a probate order, factual findings of the probate court are entitled to the same deference as any other trier of fact:
“An order of the probate court arrives in the appellate court clothed with the presumption of its correctness and will be affirmed if it can be supported on any theory.... The findings of a probate court are entitled to the same weight as the findings of any other trier of fact.... The burden is on the appellant to show that the findings and order of the probate court are clearly erroneous.... ”
Estate of Conger v. Conger, 414 So.2d 230, 233 (Fla. 3d DCA 1982) (internal citations omitted) (quoting Beck v. Beck, 383 So.2d 268, 272 (Fla. 3d DCA 1980)).
In construing a will, the polestar for the court is the intent of the testator. See Morgenthaler v. First Atl. Nat’l Bank of Daytona Beach, 80 So.2d 446, 452 (Fla.1955). “The testator’s intent is to be measured by the language he selected and used by looking at the entire instrument, not isolated words, clauses or paragraphs. ... We give greater weight to the stated chosen words of the testator as opposed to the unstated words or silence on the part of the testator.” Bourgeois v. Eberhart, 472 So.2d 1274, 1276 (Fla. 4th DCA 1985) (internal citation omitted). The trial court appropriately cited to In re Pratt’s Estate, 88 So.2d 499, 504 (Fla.1956), for the proposition that “[t]he law of wills is calculated to avoid speculation as to the testator’s intent and to concentrate upon what he said rather than what he might, or should, have wanted to say.”
Substantial competent evidence supports the trial court’s conclusion that, through the employment codicil, Milton did not intend to confer a guarantee of lifetime employment in the corporate headquarters of his father’s vast conglomerate company. It is apparent that the trial court gave little credence to Thomas’ testimony that his father had promised him that he would take over the company. The court placed greater importance on the testimony of the trusted business associates of Milton as well as the entire structure of Milton’s estate and business continuation plan. Most significantly, the court found that Milton had ample opportunity during his lifetime to provide for the type of guarantee of employment that Thomas stated his father desired, yet his father never ordered preparation of any employment agreement between Thomas and the company. Indeed, providing lifetime employment with the company would appear at odds with Milton’s grant of authority to his fiduciaries to sell the company. Given the inconsistency between what Thomas claims his father wanted for him and Milton’s carefully thought out plans for his company and its management, the trial court adhered to the principles of construction and placed its reliance on the words the testator chose as opposed to those he did not state.
Furthermore, the trial court found, and we concur, that the first sentence of the employment codicil was a precatory statement, not a mandatory directive. It expressed Milton’s desire for his son. Thus, his desire was for his son to “continue to be employed” by the company. As this was a precatory statement, it does not compel a conclusion that Milton’s intent was to provide lifetime employment with Grant Communications, particularly where Thomas’ past performance did not convince his father that he was a capable employee. The court interpreted the second sentence as a directive for Bessemer and the business trustee to make arrange- *837 merits for a suitable position in the firm at the stated salary. The court found that it did not guarantee lifetime employment and was satisfied by the acquisition of employment at the television station in Huntsville.
The court’s determination in part rested on its conclusion that employment could not be devised. We need not determine whether any type of employment can be the subject of a testamentary direction, because we conclude that the court correctly found that this employment within Grant Communications could not be the subject of a testamentary direction binding upon the officers and directors of the various companies in the conglomerate. To so find would conflict with the fiduciary duties of officers and directors to the corporation and its creditors. See § 607.0830(1), Fla. Stat.; In re Aqua Clear Techs., Inc., 361 B.R. 567, 574 (Bkrtcy.S.D.Fla.2007). Directors and officers must act in the best interests of the corporation, not the employee. The trial court acknowledged this when it found that Milton could not bind the decisions of the officers and directors of the corporation after his death. His own trust documents acknowledged as much by giving to the personal representative and business trustee the power to hire and fire employees, even beneficiaries under the will and trust. A testamentary direction to guarantee Thomas employment within the company, regardless of circumstances or detriment to the corporation, could compel the violation of fiduciary duties of the officers and directors to the corporation. This would be a violation of statutory duties and the public policy behind them.
Two cases in Florida involve a will provision directing employment. In re Estate of Marks, 83 So.2d 853 (Fla.1955), and In re Estate of Fresia, 390 So.2d 176 (Fla. 5th DCA 1980), involve directions to the personal representative — to hire a lawyer in the case of Marks, and a real estate agent in the case of Fresia — for the administration of the estate. Both courts held that a will provision could not compel a personal representative to hire a specific person who would be acting in a fiduciary capacity because of the confidential relationship between the personal representative and a fiduciary. Although not otherwise on point, these cases support the proposition that a testamentary provision cannot inject coercion into a fiduciary relationship. Similarly, to construe the employment codicil in this case as mandatory on the directors and officers of the company, through the personal representative and business trustee, coerces them to employ Thomas even though it may violate their fiduciary duty to the corporation.
Thomas cites to several older out-of-state cases in which trial courts upheld a will provision directing employment. See, e.g., In re Hand’s Estate, 315 Pa. 238, 244, 172 A. 666, 669 (1934); In re Ingles’ Estate, 76 Pa. 430 (1894). These cases all involved the employment by the personal representative of non-fiduciary employees to assist in the administration of the estate. One case involves employment with the testator’s company. In Hughes v. Hiscox, 105 Mise. 521, 174 N.Y.S. 564 (N.Y.Sup.Ct.1919), the will of the testator provided: “In consideration of his faithful and efficient services and knowledge of the business, I will and direct that my son-in-law, Charles R. Hughes, be retained and employed in the conduct of said business ... at a salary of two thousand ($2,000) dollars per year.” Id. at 565. The court ruled that although a testator could not require his executor or trustees to employ an attorney named by him (because of the fiduciary relationship), there was no authority preventing a testator from requiring his executor or trustees to employ a designated person in some other capacity *838 not involving a relationship so highly confidential as that of an attorney/client. However, the opinion does not discuss whether the executor or trustees owed a fiduciary duty to the corporation which would render the phrase unenforceable as a mandatory directive. We therefore find Hughes inapposite and of little persuasive value.
More on point is In re Pittock’s Will, 102 Or. 159, 199 P. 633 (1921). There, the testator owned a majority of shares of a publishing company which he left in trust for twenty years and ordered that none of the stock be sold. A provision of the will directed his trustees to vote themselves as directors and further requested and desired that two long-time employees be retained as manager and managing editor of the company. The court held that the testamentary direction to vote the shares of stock for his trustees as directors was a valid testamentary exercise of the right of ownership of the stock. With respect to the direction to employ certain persons with the corporation, the court found that the direction was precatory and not a mandatory requirement to hire the individuals. The court looked to the entire trust provisions which gave the trustees full and complete authority to manage the estate and complete power to vote his stock as well as all other incidents of stock ownership. The court noted, however, that:
it is not shown or intimated that the agreement, if there was one, to employ Morden and Piper [manager and managing editor], would be harmful to the best interests of the corporation or hurtful to the interests of the other stockholders, or that it was based upon any benefit private or personal to Pittock. Their long retention in the service of the corporation attests their ability and faithfulness, and in the light of the best authorities it was legitimate for the controlling stockholder so to shape the direction of his property and his testamentary instructions to his trustees as to express his best judgment and give it effect in corporate operation through the regular channel of a board of directors elected by that stock.
We glean from this that, even though prec-atory, the provision was made for the benefit of the corporation as opposed to the benefit of the testator or a third party. In contrast, the employment provision in this case was not for the benefit of the corporation but solely for the benefit of Thomas.
Howell v. Sykes, 136 N.C.App. 407, 526 S.E.2d 183 (2000), is also instructive. There the sole shareholder of a corporation devised her shares to her nieces specifically subject to an agreement that the shareholder made with one of her employees that he receive his same annual salary for life. The corporation and one of the nieces brought suit for declaratory judgment to determine the interpretation of that clause. The trial court construed the clause as imposing a lien on the shares of stock bequeathed to the nieces for the amount of the lifetime salary.
In upholding the trial court’s interpretation, the appellate court used a familiar rule of construction that a court should search for a meaning that will uphold the clause rather than to invalidate it: “Where a devise or bequest would be invalid or unlawful under one construction, but would be valid under a different interpretation, the latter must prevail because it is presumed the testatrix intended a valid disposition of her property.” Howell, 526 S.E.2d at 185 (citing Poindexter v. Wachovia Bank & Trust Co., 258 N.C. 371, 128 S.E.2d 867 (1963)). The corporation argued that requiring the officers and directors to vote to pay the lifetime contract could mean that they would be violating their duty to the corporation, its shareholders, and creditors. Because the trial *839 court imposed the charge on the stock, the appellate court discounted that argument, although it found that had the provision not been so construed, the claim would implicate a violation of fiduciary duty:
Plaintiffs’ arguments with respect to a potential conflict between the duties owed by [the shareholder] and other directors to [the corporation] and its creditors, and the obligation to cause the corporation to make payments to [the employee] in accordance with Article Three, would have merit had the trial court interpreted Article Three to require that [the corporation] provide lifetime support and benefits to [the employee], as such an interpretation would have placed an impermissible restraint upon [the corporation]’s directors and would be arguably ultra vires .... However, in this case, the trial court imposed no such duty upon [the corporation] and, following the rule that a court should search for a meaning which would give effect to, rather than nullify, the intent of the testator, construed Article Three as “impos[ing] a charge” upon the shares bequeathed to [the shareholder] for the payments to [the employee].
(emphasis supplied) (citations omitted). The court pointed to North Carolina statutes imposing a duty on behalf of directors to act in good faith in the best interests of the corporation. See N.C. Gen.Stat. § 55-8-30 (General Standards for Directors). Florida has the same standards. See § 607.0830(1), Fla. Stat.
Applying the reasoning of Howell to this case, we conclude that the trial court interpreted the employment clause in a way to preserve it to the extent that it could be enforced without encroaching on the fiduciary duties of the personal representative, business trustee, directors and officers of the corporation. In considering the great degree of power and discretion given to the personal representative and business trustee in the operation and management of the companies, including their right to discharge employees including beneficiaries and to sell the corporation, the court interpreted the clause to require the personal representative to obtain employment for Thomas with the company but not to compel them to retain him contrary to their fiduciary obligation to the corporation. Unlike Howell, Milton did not make the employment provision subject to any specific bequest. Therefore, it could not be enforced as a charge against a specific stock bequest.
Milton placed great trust in his business trustee and the people he chose to run the company. We think the trial court correctly construed the employment codicil to reflect Milton’s present intention of wanting Thomas to continue working for his companies but giving deference to his fiduciaries’ responsibility to the corporation as to Thomas’ future employment.
For the foregoing reasons, we affirm the decision of the trial court.
GROSS, J„ and STONE, BARRY J„ Senior Judge, concur.