DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**WESTLAKE FLOORING COMPANY, LLC** d/b/a
**WESTLAKE FLOORING SERVICES,**
Appellant,

v.

**MIAMI MOTORSPORTS, LLC, POLEKA, LTD.,** et al.,
Appellees.

No. 4D2024-2659

[October 22, 2025]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; William W. Haury, Jr., Judge; L.T. Case No. CACE17013399.

Alan M. Pierce of Liebler Gonzalez & Portuondo, Miami, for appellant.

Gerardo A. Vazquez and Ralph R. Longo IV of VHL Law, Miami, for appellee Poleka Ltd.

No appearance for appellee Miami Motorsports, LLC.

SHULLMAN, SARAH L., Associate Judge.

This appeal involves competing security interests under the Uniform Commercial Code ("UCC"). Westlake Flooring Company ("Westlake") challenges the trial court's final judgment after a bench trial, entered in favor of Poleka, Ltd. ("Poleka") on Poleka's claims that Westlake wrongfully repossessed motor vehicles in which Poleka claimed a possessory interest. We reverse because Westlake had a superior security interest in the collateral at issue, which defeats Poleka's claims and entitles Westlake to foreclose on its security agreement.

### *Factual Background*

*A. The Poleka Stock Pledge Agreement*

In November 2014, Miami Motorsports ("Motorsports"), an auto dealership, executed a promissory note in Poleka's favor for $8,000,000. The same day, Motorsports executed a stock pledge agreement, in which

Motorsports pledged to Poleka a security interest in shares of Motorsports' capital stock to secure the $8,000,000 loan. Specifically, the stock pledge agreement provided:

> [Motorsports] hereby pledges, assigns, grants a security interest in, and delivers to [Poleka], the shares of capital stock described in Exhibit "A" annexed hereto, (capital stock shall refer to all outstanding and issued Membership Units of [Motorsports]) . . . . "Collateral" means the shares of capital stock described in Exhibit "A" attached hereto pledged to [Poleka] hereunder, and all income therefrom, increases therein and proceeds thereof.

Over a year before executing the stock pledge agreement, Poleka had recorded a UCC-1 financing statement. The Poleka UCC-1 covered the following collateral: "Any and all present and future goods and inventory, to include motor vehicles, now owned or hereafter acquired. All of Debtor's accounts, accounts receivables, contract rights and receivables, now and hereafter existing or arising."

### B. The Westlake Loan and Security Agreement

In July 2015, Motorsports executed a promissory note in Westlake's favor for $3,000,000. The same day, Motorsports and Westlake executed a loan and security agreement, in which Motorsports pledged a security interest in Motorsports' vehicle inventory to secure the loan. Specifically, the loan and security agreement provided:

> [Motorsports] hereby grants [Westlake] a security interest in all of [Motorsports'] assets and properties, now owned and hereinafter acquired, wherever located, including all Vehicles, inventory, parts and accessories inventory, equipment, goods . . . documents of title, residues, and property of any kind relating to the foregoing.

The loan and security agreement provided Westlake the right to "take immediate possession of Vehicles [] without demand or further notice and without legal process" upon Motorsports' default, and "to enter upon the premises wherever Vehicles [] may be and remove same." A week later, Westlake recorded a UCC-1 financing statement against Motorsports' assets, which covered the following collateral:

> All [Motorsports'] assets and properties wherever located, including without limitation all equipment of any kind or nature, all vehicles, vehicle parts and inventory now owned or

2

hereafter acquired, [] purchase money inventory, the purchase of which was financed or floorplanned by Westlake . . . .

## C. The Default, Repossession, and Lawsuit

Motorsports defaulted on its obligations to Westlake, and Westlake invoked its contractual right to repossess the vehicles on Motorsports' lot. Westlake also brought a replevin action to repossess Motorsports' vehicles, ultimately obtaining a default final judgment against Motorsports.

Westlake brought one claim against Poleka: an action to establish the superiority of, and foreclose on, Westlake's security agreement with Motorsports. Poleka filed three counterclaims against Westlake, for: (1) deceptive, unconscionable, and unfair trade practices; (2) unlawful conversion of collateral; and (3) a declaration that Poleka has a superior interest in Motorsports' property.

The case proceeded to a bench trial. The trial court dismissed Poleka's unfair trade practices counterclaim, and the parties agreed that the remaining claims focused on whether Westlake or Poleka had a superior security interest in the repossessed vehicles.

The testimony established that Westlake had possessory rights to 159 vehicles (the "undisputed vehicles"). Poleka's subsidiary, Versys Auto Finance, was the lienholder on 33 remaining vehicles (the "disputed vehicles"). Motorsports surrendered the title certificates to the 33 disputed vehicles to Poleka. Poleka was never a titleholder or lienholder on the disputed vehicles.

Before Westlake's repossession, agents of Westlake and Poleka had agreed to physically separate the vehicles. The parties placed the disputed vehicles into Motorsports' north lot, which was bounded by a fence, and the undisputed vehicles into the south lot. Westlake then proceeded to repossess its undisputed vehicles, and Poleka blocked the entrance to the north lot with one of the disputed vehicles and a locked chain.

When Poleka's representatives later returned to the lot, they discovered the disputed vehicles had been removed by Westlake.

## D. The Final Judgment

Poleka argued to the trial court that Westlake's repossession of the disputed vehicles under cover of night, in violation of their agreement, constituted unlawful conversion. Relying on this argument, the trial court found that Westlake had engaged in self-help and took possession of the disputed vehicles from a separate locked location, thereby entitling Poleka to judgment on its claims for conversion and declaratory relief.

This finding also supported the trial court's ruling against Westlake on its claim for foreclosure of its security interest. The court entered final judgment for Poleka and against Westlake in the amount of $140,000, plus $80,123.46 in pre-judgment interest.

### *Legal Discussion*

"Generally, a trial court's findings present 'mixed questions of law and fact, and the appellate court decides whether the factual findings are supported by competent substantial evidence and the findings of law are reviewed *de novo*.'" *Miller v. Moore*, 391 So. 3d 938, 940 (Fla. 4th DCA 2024) (quoting *Grant v. Bessemer Tr. Co. of Fla., Inc. ex rel. Grant*, 117 So. 3d 830, 835–36 (Fla. 4th DCA 2013)). Following a bench trial, "the trial judge's findings of fact are clothed with a presumption of correctness on appeal, and these findings will not be disturbed unless the appellant can demonstrate that they are clearly erroneous." *Portner v. Koppel*, 382 So. 3d 742, 747 (Fla. 4th DCA 2024) (citation omitted).

### A. *Priority of Security Interests Under the UCC*

Article 9 of Florida's UCC governing secured transactions is found in Chapter 679, Florida Statutes. *HSBC Bank USA, N.A. v. Perez*, 165 So. 3d 696, 699 (Fla. 4th DCA 2015). Chapter 679 applies to "[a] transaction, regardless of its form, that creates a security interest in personal property or fixtures by contract." § 679.1091, Fla. Stat. (2015).[1]

As explained by White and Summers, "Article 9 includes many 'priority' rules—rules which determine who prevails as between competing claimants to the collateral. Many of these rules operate one way rather than another depending mainly on whether the interests involved are perfected." 4 James J. White & Robert S. Summers, *Uniform Commercial Code,* § 31-1 (4th ed. 1995).

First comes attachment. UCC Section 9-203 "lays out the steps a party must take to create an Article 9 security interest. Once these steps are taken[,] the security interest comes into existence. The Article 9 drafters label this magic event 'attachment.'" *Id.* Attachment has two consequences: the security interest becomes enforceable against the debtor, as well as against third parties. *Id.* (citing §§ 9-203(1), 9-201). *Perez*, 165 So. 3d at 700. "'Attachment' is the coming into existence of a security interest; it relates to the creation and enforceability of a security interest between the parties to a transaction." *In re Climate Control Mech.*

---

[1] A security interest is "an interest in personal property or fixtures which secures payment or performance of an obligation." § 671.201(38), Fla. Stat. (2015). A security agreement is "an agreement that creates or provides for a security interest." § 679.1021(1)(uuu), Fla. Stat. (2015).

*Servs., Inc.*, 570 B.R. 673, 679 (Bankr. M.D. Fla. 2017) (quoting 47 Fla. Jur. 2d Secured Transactions § 133 (2017)).

Under Florida law, a security interest attaches to collateral when it becomes enforceable against the debtor. § 679.2031(1), Fla. Stat. (2015). *Perez*, 165 So. 3d at 699. A security interest in collateral is enforceable against the debtor, along with third parties, when: (1) value has been given; (2) the debtor has rights in the collateral or the power to transfer collateral rights to a secured party; and (3) the debtor has signed a security agreement that describes the collateral, among other unrelated options. *See* § 679.2031(2)(a)–(c)1., Fla. Stat. (2015).

Describing the collateral is key to enforceability. A description of personal or real property is sufficient, whether or not it is specific, if it reasonably identifies what is described. § 679.1081(1), Fla. Stat. (2015). A description reasonably identifies the collateral if done by specific listing or category, among other options. § 679.1081(2), Fla. Stat. (2015). Listing "all the debtor's assets" or "all the debtor's personal property" or using words of similar import does not reasonably identify the collateral for purposes of the security agreement. § 679.1081(3), Fla. Stat. (2015). *See Charlotte Dev. Partners, LLC v. Tricom Pictures & Prods., Inc.*, 33 So. 3d 690, 693 (Fla. 4th DCA 2009) (noting that a description of the collateral is required to create an enforceable security interest). Section 9-203 is principally a statute of frauds; "it is designed mainly to minimize disputes over whether there was an agreement and over what collateral it could have covered." White & Summers, § 31-4.

The next step above attachment is perfection. "Chapter 679 distinguishes 'attachment' of a security interest from its 'perfection.' It is perfection that affords maximum secured creditor protection against third parties." *Perez*, 165 So. 3d at 696 (citation omitted).

A security interest is perfected if it has attached and all of the applicable requirements for perfection in sections 679.3101–679.3161 have been satisfied. § 679.3081(1), Fla. Stat. (2015). In most cases, a financing statement must be filed to perfect all security interests. § 679.3101(1), Fla. Stat. (2015). In contrast to attachment, "'perfection' relates to the doing of some additional act, usually the filing of a financing statement, required to make the security interest effective as against third parties; a security interest cannot be perfected before it has attached." *Climate Control*, 570 B.R. at 679 (citation omitted). "Perfection of a security interest gives constructive notice to the world of the claim or interest of the one asserting it." *Bay Cnty. Sheriff's Off. v. Tyndall Fed. Credit Union (TFCU)*, 738 So. 2d 456, 458 (Fla. 1st DCA 1999).

5

Conflicting perfected security interests rank according to priority in time of filing or perfection. § 679.322(1)(a), Fla. Stat. (2015). A perfected security interest has priority over a conflicting unperfected security interest. § 679.322(1)(b), Fla. Stat. (2015). The first security interest to attach or become effective has priority if conflicting security interests are unperfected. § 679.322(1)(c), Fla. Stat. (2015). *See Rayfield Inv. Co. v. Kreps*, 35 So. 3d 63, 65 (Fla. 4th DCA 2010) ("The Florida UCC explicitly provides that a perfected security interest in goods takes priority over all subsequently perfected and unperfected security interests in the same goods."). "The perfected secured creditor is nearly as far above the unperfected secured creditor in the priorities pecking order as the unperfected secured creditor is above the general creditor. Perfection also earns the secured party priority over a subsequent lien creditor." White & Summers, § 31-7.

The final step is the remedy. After default, a secured party may notify an account debtor to make payment. § 679.607(1)(a), Fla. Stat. (2015). Further, a secured party may take possession of the collateral either pursuant to judicial process, or without judicial process if it proceeds without breach of the peace. § 679.609(1)(a), (2), Fla. Stat. (2015).

*B. Westlake Had a Superior Security Interest in the Disputed Vehicles*

UCC Article 9 determines the priority of interests in this action. *See Kreps*, 35 So. 3d at 67 ("The rules for acquiring and enforcing security interests were not written to permit individualized justice and equity contrary to their requirements. . . . The statutes give us no authority to refuse to enforce priorities under UCC Article 9 . . . .").

Here, Westlake had an enforceable and perfected security interest in the disputed vehicles, and Poleka did not, giving Westlake priority over Poleka's unperfected interest. Our conclusion rests on two grounds.

First, Poleka's agreement with Motorsports did not attach to the collateral, i.e., the disputed vehicles. The stock pledge agreement, aptly named, granted a security interest to Poleka in Motorsports' "shares of capital stock," defined as "all outstanding and issued Membership Units." These categories are insufficient to reasonably identify motor vehicles as collateral. § 679.1081(3), Fla. Stat. (2015). *Tricom*, 33 So. 3d at 693 (holding that a judgment creditor's lien was superior to appellant's unperfected security interest in a cash bond, where the bond did not fall under any of the categories of collateral described in appellant's financing statement that was presumed to contain the same description as in its security agreement). Poleka's stock pledge agreement therefore did not grant a security interest in the disputed vehicles.

The Poleka UCC-1, filed long before the stock pledge agreement was executed, lists the collateral as "all present and future goods and inventory, to include motor vehicles, now owned or hereafter acquired." However, a financing statement cannot overcome a security agreement that fails to provide a sufficient description of the collateral. *See* §§ 679.1081(1), 679.3081(1), Fla. Stat (2015).

"It is well-established in Florida that the purpose of the financing statement is merely to provide notice of a possible security interest in the collateral in question. . . . [T]he purposes of a financing statement allow a more abbreviated description of the collateral in a financing statement than in a security agreement." *Chase Bank of Fla., N.A. v. Muscarella*, 582 So. 2d 1196, 1198 (Fla. 2d DCA 1991) (citation omitted). *See also Am. Rest. Supply Co. v. Wilson*, 371 So. 2d 489, 490 (Fla. 1st DCA 1979) ("The security agreement is the contract between the parties; it specifies what the security interest is. Because of its different function, greater particularity in the description of collateral is required in the security agreement than in the financing statement." (citation omitted)). "Unlike the security agreement, a financing statement was not designed to create a security interest but to perfect the interest already attached." *In re Fla. Bay Trading Co.*, 177 B.R. 374, 381 (Bankr. M.D. Fla. 1994) (citation omitted). "The 'description of collateral contained in a financing statement may have the effect of restricting the security interest created in a security agreement but cannot enlarge it.'" *Dickason v. Marine Nat'l Bank of Naples, N.A.*, 898 So. 2d 1170, 1175 (Fla. 2d DCA 2005) (quoting *In re Amex-Protein Dev. Corp.*, 504 F.2d 1056, 1061 (9th Cir. 1974)).

The Poleka UCC-1 could not enlarge the collateral's description in the security agreement—i.e. capital stock—to include motor vehicles. Thus, Poleka did not have a security interest in the disputed vehicles.

Westlake's loan and security agreement, on the other hand, specifically granted Westlake a security interest in the disputed vehicles, as the agreement reasonably identified the collateral by the category of "all vehicles." § 679.1081(2)(b), Fla. Stat. (2015). Westlake's security interest in the disputed vehicles was enforceable against third parties, including Poleka, because: (1) value was given; (2) Motorsports had rights in the collateral; and (3) Motorsports signed a security agreement that describes the collateral. § 679.2031(2)(a)–(c)1., Fla. Stat. (2015). Thus, Westlake's security interest attached to the disputed vehicles.

Second, as Poleka's interest never attached to the vehicles, Poleka could not perfect a security interest in the vehicles, regardless of whether Poleka filed a UCC-1 financing statement. *See* § 679.3081(1), Fla. Stat. (2015). On the other hand, Westlake perfected its security interest, because the security interest attached to the vehicles and Westlake filed a financing

7

statement that covered Motorsports' assets, including "all vehicles, vehicle parts and inventory." *See Climate Control*, 570 B.R. at 679.

As a result, Westlake had a superior security interest in the disputed vehicles, because a perfected security interest has priority over a conflicting unperfected security interest. § 679.322(1)(b), Fla. Stat. (2015). As the secured party with priority, Westlake was entitled to take possession of the collateral without judicial process. § 679.609(1)(a), (2), Fla. Stat. (2015). Thus, the disputed vehicles were not, as argued by Poleka, required to be included in Westlake's replevin action.

### C. Poleka Waived its Unpled Claims and Defenses

Poleka's argument that it had physical possession of the paper titles to the disputed vehicles is irrelevant. Putting aside the fact that Poleka's subsidiary—a distinct legal entity—was the lienholder, to establish a conversion claim, a plaintiff must have a possessory right to the property. "Conversion is an 'act of dominion wrongfully asserted over another's property inconsistent with his ownership therein.'" *Rosenthal as Tr. of Barry Rosenthal Revocable Tr. UAD 11-17-2009 v. Equus Prop. Homeowners HOA, Inc.*, 369 So. 3d 719, 722 (Fla. 4th DCA 2023) (quoting *Edwards v. Landsman*, 51 So. 3d 1208, 1213 (Fla. 4th DCA 2011)). "To state a claim for conversion, one must (1) allege facts sufficient to show ownership of the subject property and (2) facts that the other party wrongfully asserted dominion over that property." *Id.* (citation omitted). "The essence of an action for conversion is 'not the acquisition of the property of the wrongdoer, but the wrongful deprivation of a person of property to the possession of which he is entitled.'" *Taubenfeld v. Lasko*, 324 So. 3d 529, 542 (Fla. 4th DCA 2021) (quoting *Star Fruit Co. v. Eagle Lake Growers, Inc.*, 160 Fla. 130, 33 So. 2d 858, 860 (1948)).

A secured creditor may be granted the right to possession upon default, which Westlake was under its security agreement. However, a lienholder "with no right of possession cannot maintain an action for conversion of the liened property." *Matter of Dino*, 17 B.R. 316, 318–19 (Bankr. M.D. Fla. 1982). Poleka never established that it had a security interest in the disputed vehicles, or that any agreement granted Poleka or even Versys the right to immediate possession upon Motorsports' default. *See Ginsberg v. Lennar Fla. Holdings, Inc.*, 645 So. 2d 490, 499 (Fla. 3d DCA 1994) (finding that conversion claim "must fail" where loan documents "required some affirmative act" before vesting mortgage assignee with immediate right to possession upon default), disagreed with on other grounds by *Condo. Ass'n of La Mer Ests., Inc. v. Bank of N.Y. Mellon Corp.*, 137 So. 3d 396 (Fla. 4th DCA 2014). In fact, Poleka did not present any evidence that Motorsports was in default of any agreement with Poleka. Simply put, physical possession does not always vest one with the *right* of possession.

Poleka argued on appeal that Westlake's breach of the peace supported its claim for conversion. Such a claim was not framed in the pleadings or tried by consent. The trial court found that Westlake engaged in self-help; however, the trial court did not find that Westlake committed a breach of the peace. Not all self-help techniques result in a breach of the peace. *Cf. Northside Motors of Fla., Inc. v. Brinkley*, 282 So. 2d 617, 624 (Fla. 1973) (upholding the right to use self-help for repossession so long as it is accomplished without breach of the peace); *see also Brescher v. Assocs. Fin. Servs. Co.*, 460 So. 2d 464, 467 (Fla. 4th DCA 1984) (noting the passage of section 679.503 "to provide secured parties, upon default, with the most effective remedy available: the right to take possession of the collateral" including "two all-encompassing methods, self-help and judicial process."); *Raffa v. Dania Bank*, 321 So. 2d 83, 85 (Fla. 4th DCA 1975) (holding in part that repossession of car parked in driveway was conclusively "non-actionable" where there was no entry into a home or other closed building, and noting there need be "something more" than merely entering the real property of the debtor). Accordingly, Poleka may not raise this argument for the first time on appeal. Even if a breach of peace had occurred, such an event would not have vested Poleka with a possessory interest to support a conversion claim.

Finally, Poleka also failed to preserve its argument that Westlake could not simultaneously pursue replevin and self-help. "The doctrine of election[] of remedies exists to prevent a party from recovering twice for the same wrong." *United Cos. Fin. Corp. v. Bergelson*, 573 So. 2d 887, 888 (Fla. 4th DCA 1990). Because Poleka "failed to raise the affirmative defense of election of remedies below, it is therefore waived." *Law Offs. of Harold Silver, P.A. v. Farmers Bank & Tr. Co. of Ky.*, 498 So. 2d 984, 986 (Fla. 1st DCA 1986) (citation omitted). The tipsy coachman doctrine is "inapplicable to an unpled affirmative defense." *Clearcare, LLC v. Granada Ins. Co.*, 367 So. 3d 540, 543 (Fla. 4th DCA 2023).

## Conclusion

As Westlake had a superior security interest in the disputed vehicles and was entitled to take possession of the collateral, we must conclude that the trial court erred in entering final judgment for Poleka. We reverse and remand for the trial court to enter final judgment in Westlake's favor on its claim to foreclose its security agreement and on Poleka's claims for unlawful conversion and declaratory relief.

*Reversed and remanded with directions.*

GROSS and GERBER, JJ., concur.

\* \* \*

9

*Not final until disposition of timely-filed motion for rehearing.*